## Staunton.

### FINCHIM v. THE COMMONWEALTH.

SEPTEMBER 22d, 1887.

CRIMINAL PROCEEDINGS— *Murder* — *Circumstantial evidence—Case at bar.*—The record discloses concurrent facts of time, place, means, opportunity, motive, and subsequent conduct, pointing to the prisoner as the perpetrator of the crime for which he stands indicted, that fully warranted the jury, acting with that utmost caution with which circumstantial evidence should always be acted on, in arriving at their verdict of guilty of murder in the first degree.

Error to judgment of circuit court of Rockingham county, refusing a writ of error to the judgment of the county court of said county, sentencing to be hanged by the neck until dead, the prisoner, Finchim, whom the jury had found guilty upon the trial of the indictment against him for the murder, in the first degree, of his brother, Preston Finchim. To this judgment the prisoner obtained from one of the judges of this court a writ of error and *supersedeas.* Opinion states the case.

*W. S. Lurty* and *W. L. Yancey,* for the plaintiff in error.

*R. A. Ayers,* attorney-general, for the Commonwealth.

LEWIS, P., delivered the opinion of the court.

The single question in the case arises upon the prisoner's exception to the action of the county court in overruling his motion for a new trial. The motion was based upon

the ground that the verdict was not warranted by the evidence; and the evidence being conflicting, the court, on that ground, refused to certify the facts, but did certify the evidence, so that the case stands upon a certificate of the evidence.

In such a case, the rule—too familiar to require the citation of authority—is that the judgment of the lower court must be affirmed, unless, after rejecting all the parol evidence for the exceptor, and giving full force and credit to the evidence for the other side, the judgment still appears to be wrong.

Another rule—equally well established, and to which it may be well to advert—is that a motion to set aside a verdict fairly rendered, on the ground that the same is contrary to the evidence, or is not supported by the evidence, must be overruled, unless the verdict be plainly wrong. It is not sufficient that the court, if upon the jury, would have rendered a different verdict; but the verdict must stand unless, we repeat, it be *plainly* wrong. If the rule were otherwise, it would lead to constant invasion of the province of the jury to pass upon the facts of the case, and whose conclusions upon questions of fact are entitled to great weight, and ought not to be lightly disturbed. And the rule applies with increased force in the appellate court, where the witnesses are not seen and heard, as they were by the jury and the trial court. It is, therefore, an essential rule in the administration of justice, and ought to be maintained. *Grayson's case,* 6 Gratt. 712; *Dean's case,* 32 Id. 912; *Cluverius' case,* 81 Va. 787.

With these remarks—perhaps too trite to be necessary on this occasion—we proceed to dispose of the case as it appears to us from the evidence for the Commonwealth.

The evidence is circumstantial, and, therefore, to be acted on with the utmost caution. *Johnson's case,* 29 Gratt. 796; *Anderson's case,* 83 Va. 326. This is so in all cases of cir-

cumstantial evidence, and especially here, where the pris-
oner has not only been found guilty of murder in the first
degree, but of the murder of his own brother, with whom
he lived, and between whom and himself, so far as the
record shows, there was no open hostility. We have accord-
ingly given to the case and to the argument of counsel the
most careful consideration, mindful all the time that it
were better, in the eye of the law, that ninety-nine guilty
men should go unpunished, than that one innocent man
should suffer. All this has been done, and yet we are con-
strained to the conclusion that the evidence fully supports
the verdict of the jury, and that the judgment complained
of is right.

It appears that on the day mentioned in the indictment,
in the evening, about dark, the dead body of the deceased
was found in the woods—"a thick, brushy woods," in the
language of the witnesses—about three hundred yards
from Lewis Clarke's blacksmith shop, in Rockingham
county. According to the medical evidence in the case,
death had probably occurred several hours before the body
was found. There was a bruise on the back of the head,
apparently made with some blunt instrument, and the
right side of the head was partially blown away—done, we
think the evidence shows, by the discharge of a loaded
gun, in the hands of an assassin, from behind, at short
range. The wounds were such as to cause death. There
is no question as to the *corpus delicti*. The deceased had
left his home, in the neighborhood of Clarke's shop, about
daylight on the morning of the same day, and went to
Hugh Leach's to collect the balance of a debt due him by
Leach on the sale of a horse. He arrived at Leach's about
sunrise, and obtained an order for the payment of a small
sum of money on Clarke, the blacksmith. He declined an
invitation from Leach to breakfast, on the ground that he
had *an engagement to meet his brother* (the prisoner)—he

did not say for what. He was addicted to drink, and the same morning he went to the house of S. C. Naylor, a distiller in the neighborhood, to get brandy. There he got three pints of brandy, which was put into three pint bottles, two of which were black. From there he started for Clarke's shop.

The prisoner left home about eight o'clock the same morning, riding his brother's horse to be shod. He took with him a gun and ammunition, and was followed by a dog, which plays a not unimportant part in the tragedy that ensued. He went directly to Clarke's shop. Upon his arrival there, finding Clarke temporarily absent, he asked the witness, Taliaferro, to tell him when he returned to shoe the horse. He hitched the horse and left the shop on foot. He had a mattock, which he left to be sharpened; but he did not leave the gun; that he took with him, going in the direction of the woods above mentioned. When he was leaving home, he called the dog to follow him, saying he wanted it to tree a squirrel. But when he went to the woods he left the dog at the shop. This was between eight and nine o'clock in the morning.

About eleven o'clock, the deceased came to the shop from the direction of the woods, and inquired of Clarke (who in the meantime had returned) if his horse was shod. The latter replied that it had been shod before, but not behind; whereupon he directed him to put on old shoes behind, at the same time inviting him to take a drink of brandy out of a black bottle he had, which he did. The deceased then remarked that he had more "down in the bushes," and that when he returned to the shop he would give him (Clarke) "a good dram." He then started for the woods, followed by the dog that had followed the prisoner to the shop. He went in the direction whence he had come, saying he would return in about fifteen minutes. He never returned alive.

About a half hour afterwards, several of the witnesses heard the report of a gun in the woods in the direction in which the prisoner and the deceased had gone; soon after which (within a half hour) the prisoner returned to the shop with the gun on his shoulder, again followed by the dog. He asked Clarke to fix the gun, to which the latter replied that he did not work on guns. The gun was empty, and when examined that night it appeared to have been recently discharged. The prisoner had a black pint bottle, in which was brandy, from which he invited Clarke to take a drink, which he did. The bottle looked like the one the deceased had at the shop a short while before; and Clarke testifies that he remarked, when he had swallowed the liquor, that it tasted like the brandy "Pres." (the deceased) had given him. He also testifies that he remarked to the prisoner that the deceased had gone away, saying he would return in fifteen minutes, to which the prisoner replied that when "Pres." was drinking, he would sometimes go away, saying he would return in a few minutes, and be gone three or four days.

The same witness also testifies that he told the prisoner the deceased had gone in the direction of the woods, whereupon he said he would go and find him. He started for the woods, but had not gone far when he stopped short, cut a switch and returned to the shop, saying he couldn't see him. He then got on the horse and went home, leaving the gun at the shop, notwithstanding he had been told that Clarke did "not work on guns." Several of his neighbors who knew him testify that they never saw the prisoner with a gun before.

The dog remained about the shop a short while after the prisoner's departure, and then disappeared. It seems it returned to the woods to guard the body of the deceased, and it was by its running out at a passer-by that the body was discovered.

That night, after the body had been found, it was re-
moved to Clarke's shop. Only one black bottle was found
with the body. Of the two the deceased had in the morn-
ing, one was gone. After the body had been removed, two
of the neighbors, who had assembled at the shop, pro-
ceeded to the house of the deceased to inform his family
of his death. Upon their arrival at the house the prisoner
came to the door, when they told him his brother was
dead. He inquired, "Who killed him?" They suggested
to him to go for the body; but he said he couldn't, because
the wife of the deceased was sick. He said he would see
Lewis McDaniel and get him to go. He then went to
McDaniel's house, near by, and told him that "Pres." was
absent and drunk and helpless, and asked him to go and
look after him. But McDaniel declined, and so neither
went.

Late that night, when the body was taken to the house,
and the neighbors who took it knocked at the door, a noise
was heard as of a man jumping out of bed to the floor, and
then footsteps were heard *crossing the room* to the door.
In the room was a bed, in which was the widow of the
deceased, and in another part of the room, *near the door*,
there was a small, narrow lounge, upon which a little child
was sleeping. The prisoner came to the door and opened
it. *He came from the direction of the bed*, and after the
door was opened he seemed nervous, and acted strangely.
Neither he nor the widow had much to say, or showed
signs of grief. The prisoner was unmarried. She asked
him why he had not told her "Pres." was dead when he
first came home, saying, "You told me he was over in the
brush by Clarke's shop, drunk." To this he made no
answer, but went over to the bed where she was and
*whispered to her*. She was asked by one of the witnesses
present at what time that day the prisoner had seen the
deceased, to which she answered *about twelve o'clock*. The

witness then said to the prisoner, "I thought you did not see him to-day," whereupon she said, "Oh, I forgot; sure enough, he didn't." The prisoner said nothing. When interrogated, he said he was sleeping on the lounge when he heard the knock at the door. But the evidence shows that this was not so.

The next day an inquest was held and the prisoner was requested to appear. He did so, and made a statement attempting to account for himself the day previous. He said that after he left the blacksmith shop in the morning he "went straight to Elkton" to get his mail; but Elkton is not in the direction of the woods towards which, after leaving the shop, he was seen to go. He said he saw Mr. Joe Kite, the postmaster at Elkton, whom he knew and whom he asked for his mail; but Kite was not at Elkton or in Rockingham county that day. He said he bought two pounds of coffee of William Austin, a clerk in Antrim's store at Elkton, at the same time; but Austin had left Antrim's service two months before and was not at Elkton. He also said he saw Ed. Miller at Elkton; but Miller was absent from Elkton and did not return until two o'clock in the afternoon.

The witness Riddle, who attended to the post-office in the absence of the postmaster on the day of the homicide, swears positively and unequivocally that he (the prisoner) was not at the post-office. And not one of the numerous witnesses who were examined in the case testifies to having seen him at Elkton that day. He also made contradictory statements as to where he got the brandy he had; and, in short, his statement before the coroner's jury is disproved by the evidence for the Commonwealth in almost every essential particular.

After his arrest he said the gun wouldn't shoot, but the evidence shows that it would. And he said if he had known he was suspected he would have left and "they

never would have *ketched*" him. There was also evidence tending to show improper relations between him and the wife of the deceased before the homicide was committed— evidence that deserved, and doubtless did have, great weight with the jury in determining the case. And it may be as well to say in this connection that the suggestion, in the argument, that the guilty party may have been "the cabbage pedlar" from Greene county, who figures in the case, and who passed by near to the scene of the murder soon after it was committed, is not only repelled by the evidence, but by the remark of the prisoner himself made to a friend and relation after his imprisonment, that there was "nothing in that," or words to that effect. Nor does the evidence raise the slightest suspicion of guilt against anyone but the prisoner.

Such substantially are the principal facts of the case. And they fairly show, we think, *time, place, means and opportunity* as concurrent circumstances pointing to the prisoner's guilt. Besides these, is *the conduct* of the prisoner after the crime was committed, which, taken in connection with the whole case, produces a moral conviction of his guilt beyond a reasonable doubt. When told by Clarke that the deceased had gone in the direction of the woods, he pretended to start in search of him, but had not gone far when he turned back and rode home. That night, when told his brother was dead, his instant inquiry was "who *killed* him?" He refused to go for the body, and when McDaniel (to whom he made a false statement) declined to go, he concerned himself no further about it. Added to this apparent indifference is his strange and suspicious conduct later that night when the body was brought home. And his statements afterwards, nearly all of which were false, create the strongest presumptions against him. Such conduct is consistent only with the hypothesis of guilt.

"In all cases of circumstantial evidence," said this court in *Dean's Case, supra,* "the conduct of the accused is always an important factor in the estimate of the weight of circumstances which point to his guilt. As is said by Mr. *Starkie,* 'the connection between a man's conduct and his motives is also one of a moral nature pointed out by experience. It is by their experience of such connections that juries are enabled *to infer a man's motives* from his acts, and also to infer what his conduct was from the motive by which he was known to be influenced.' This is especially the case where the *corpus delicti* has been established by evidence *aliunde.*"

This sufficiently disposes of the contention that there is no proof of *motive* in the present case. The jury obviously thought there was, and we concur in their conclusion. They were warranted in inferring it from the prisoner's conduct, independently of the evidence tending to show improper relations between him and his brother's wife.

That murder is sometimes committed without apparent motive is indisputable. The books contain numerous such cases. Crime, it is said, is rarely logical; and murders are often, if not generally, committed from motives comparatively trivial. At all events, a jury ought not to hesitate to convict, where the evidence of guilt is in other respects satisfactory, simply because the motive from which the criminal act proceeded may seem inadequate. Were a different rule to prevail, many heinous crimes would go unpunished. 1 Whart. Crim. Law (8th ed.), § 121.

In the present case, however, it is not difficult to infer from the record what the motive was upon which the prisoner acted. It was a motive not uncommon in criminal annals, and, as experience shows, a powerful one in the commission of crime—namely, a desire to render it easier and safer to gratify lustful passion.

We are of opinion that the county court did not err in overruling the motion for a new trial, and that the judgment must be affirmed.

JUDGMENT AFFIRMED.